**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 3:23-cr-0006 |
| ) | |
| **BRIAN LIZ,** ) | |
| ) | |
| **Defendant.** ) | |

**ATTORNEYS:**

**DELIA L. SMITH, UNITED STATES ATTORNEY**
**CHERRISSE R. WOODS, ASSISTANT UNITED STATES ATTORNEY**
**EVERARD E. POTTER, ASSISTANT UNITED STATES ATTORNEY**
UNITED STATES ATTORNEY'S OFFICE
ST THOMAS, U.S. VIRGIN ISLANDS
   FOR THE UNITED STATES OF AMERICA

**DALE LIONEL SMITH, ESQ.**
NEW YORK, NY
   FOR DEFENDANT BRIAN LIZ

## MEMORANDUM OPINION

**MOLLOY, Chief Judge.**

**BEFORE THE COURT** is Defendant Brian Liz's ("Liz") *Motion to Suppress Physical Evidence and Statements Seized in Violation of the Fourth and Fifth Amendments to the Constitution of the United States*, filed on April 1, 2023. (ECF No. 29.) Liz seeks to suppress items seized from his person and from his vehicle on October 19, 2022. Liz also seeks to suppress statements he purportedly made on that same day. After several continuances, the Court held an evidentiary hearing on August 16, 2024. At the hearing, the Government presented the testimony of three officers from the Virgin Islands Police Department ("VIPD") as witnesses: (1) Officer Roger Arroyo ("Officer Arroyo"), Captain Gregory Penn ("Captain Penn"), and Sergeant James Dowe, Jr. ("Sergeant Dowe"). For the reasons stated below, Liz's motion to suppress will be granted, in part, and denied, in part.

I.     **FACTUAL FINDINGS**

**A. Tip From the Confidential Informant**

On October 19, 2022, Sergeant Dowe received a call on his personal cell phone from a known confidential informant ("CI") that a Hispanic male between 6'2" and 6'5" tall, wearing jogging pants, white T-shirt, baseball cap and sneakers "was carrying a firearm." (ECF No. 110 – Transcript of Suppression Hearing ("Tr.") at 135-36.) Sergeant Dowe testified that the CI "said there is a rifle on the driver side of the vehicle and there is also a handgun in his waist." (*Id*. at 135:20-21.)[1] The CI also described the vehicle the individual was driving as "a black Dodge RAM" bearing license plate H-2126. (*Id.* at 135:25, 143:2-3). Sergeant Dowe testified that he had a long-term relationship with the CI who gave him concrete, factual, and very reliable information between five and ten times in the past that led to seizure of contraband, and that he never received any misinformation from the CI. (*Id.* at 136:15-137:15.)

Sergeant Dowe testified that he shared the information he received from the CI with his fellow officers. (*Id.* at 138:1-2.) Officer Arroyo, an officer who was listening on the group chat, testified that he became a part of the operation when he was made aware of the CI's tip "from the officer who received it." (*Id.* at 11:11-20.) Officer Arroyo testified the information indicated that the individual "would be in the Gas Works area with a -- firearms in the vehicle, in possession of firearms inside his vehicle." (*Id.* at 11:21-25.) Officer Arroyo testified that he also heard this information directly from the CI. (*Id.* at 12:18-22.) All the information was relayed in real time and Officer Arroyo could hear the CI informing "exactly where the firearm was -- where it was going to be. He said he saw it." (*Id.* at 16:12-15).

Upon arriving at the Gas Works gas station, Officer Arroyo observed the individual, later identified as Liz, who met the description provided by the CI as an individual he had encountered in the past, a few months earlier. (*Id.* at 13:1-14:8.) During that encounter,

---

[1] Captain Penn, the supervisor of the Special Operations Bureau, testified that one of his members received information that "there was an individual in an area of Gas Works in possession of a high-powered rifle," (*id.* at 78), "where the person was, who the person was, what they were dressed, what they were driving," a black RAM truck (*id.* at 79).

Officer Arroyo observed the individual as being aggressive and confrontational with VIPD officers, pushing one of the officers and then fleeing from the officers. (*Id.* at 13:12-14.)

When Officer Arroyo arrived at the gas station, he pulled by the entrance, exited his police vehicle, immediately pulled out his firearm, approached the truck and stood between the truck and Liz. (*Id.* at 18:4-9.) Captain Penn testified that when he arrived at the gas station, Liz "started to try to beeline or tried to get back hastily to his vehicle." (*Id.* at 80:17-22.) Captain Penn positioned himself between Liz and the truck, knowing from "the information we gathered, that there was a high-powered rifle in the vehicle." (*Id.* at 80:23-81:4.) Officer Arroyo commanded Liz "Let me see your hands" "and to get on the ground, and Liz raised up his hands and took off his shirt. (*Id.* at 18:12-16) Arroyo saw that Liz was not armed, holstered his firearm, and pulled out his taser. (*Id.* at 18:16-18.) Arroyo commanded Liz to get on the ground and put his hands behind his back, but Liz failed to comply. (*Id*. at 18:21-23.) Instead, Liz walked up close to Captain Penn, "kind of chucked his arm away, . . . making a motion to push away from him," at which point Officer Arroyo told Liz he was going to tase him. (*Id.* at 18:24-19:3.) Liz then walked around another gas station pump and Officer Arroyo deployed his taser making contact with Liz's body. (*Id.* at 19:4-6.) Liz fell on the ground, was handcuffed, arrested for failure to obey the officer's commands,[2] and given his *Miranda* rights. (*Id.* at 65, 81-82.); *see also* Gov. Ex. 3. The officers then retrieved a set of keys from Liz's person. (*Id.* at 24:6-15.)

**B. Search of Liz's Truck**

Once Liz was subdued, Sergeant Dowe walked towards Liz's truck, put his eyes and hands up to the glass on the front passenger side window and looked in. (*Id.* at 146:7-21.) The gas station was very well lit. (*Id.* at 147:13.) Sergeant Dowe testified that he "saw a rifle with an AR-style-15 platform, 15-round drum and no butt[]stock" on the "driver's side of the vehicle", "closer to the gear shift, key area." (*Id.* at 146: 24-47:6.)[3] When asked only a few

---

[2] Virgin Islands law provides: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a peace officer, firefighter, or first responder of any authorized act within the peace officer's, firefighter's, or first responder's official capacity, shall do any act that hampers or impedes a peace officer, firefighter or first responder in the performance of lawful duties." 14 V.I.C. § 1508(a).

[3] Although the transcript of hearing indicates that Sergeant Dowe stated that he saw a "15-round drum" the Court believes this to be a typo and specifically recalls Sergeant Dowe testifying that he saw a firearm with a

minutes later what type of firearm he saw, Sergeant Dowe responded: "it was an AR-style – AR-15 style platform with a 50-round drum, no butt[]stock", and "I saw an AR-style-15 platform – AR-15-style platform rifle on the driver side, no butt-stock, with a 50-round drum." (*Id.* at 147:20-21, and 149:12-14, respectively)

After the discovery of the firearm, the officers made arrangements to have the vehicle towed to the police station. (*Id.* at 31:12-15.) At the Adam Command Police Station, Arroyo did a full search of the vehicle and discovered what he believed to be a machine gun on the floorboard of the driver side seat, a Glock handgun in the glove box on the passenger side of the truck, three magazines, $27,000 in cash, marijuana and other items. (*Id.* at 41:4-15.)

On April 19, 2023, a grand jury returned an indictment charging Liz with various federal and territorial offenses, namely: felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2); illegal possession off a machinegun in violation of 18 U.S.C. § 922(o) and 924(a)(2); unauthorized possession of a firearm in violation of 14 V.I.C. § 2253(a); and unauthorized possession of a machine gun by a felon in violation of 14 V.I.C. § 2253(b) and (d)(2).

## II.     DISCUSSION

In this matter, the officers seized Liz and searched his vehicle without a warrant. It is well-established that the Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures and that warrantless searches are "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The Government must establish the applicability of an exception to any warrantless search and seizure by the preponderance of the evidence. *United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014) (citations omitted). Liz also seeks to suppress his statements. The Court addresses these issues in turn.

### A. The Tip from the Confidential Informant did Not Provide the Officers with Reasonable Suspicion to Stop Liz.

The Government contends that the officers had reasonable suspicion to stop Liz because the CI provided reliable and credible information that Liz engaged in criminal

---

"50-round drum." This is consistent with other portions of the transcript wherein Sergeant Dowe testified that he observed a "50-round drum." *See* Tr. at 147:20-21; 149: 12-14.

activity. In particular, the Government argues that the CI "gave specific detailed information about the defendant . . . and the presence of a 'machine gun or a rifle' in the driver's side of the vehicle he was driving . . . was the foundation of the officers' reasonable suspicion to detain the defendant and conduct the operation." (ECF No. 113 at 1-2.)[4] Conversely, Liz argues that the officers did not have a legal basis to stop him because the CI was not credible, and the CI "provided no details about the legal status of the firearms" or "prohibited status to possess a firearm." (ECF No. 120 at 1-2.)

As noted by the Government, one exception to the warrant requirement was articulated by the Supreme Court in *Terry v. Ohio,* 392 U.S. 1 (1968), "which held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . ,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 372–73 (1993) (quoting *Terry*, 392 U.S. at 30). Reasonable suspicion of criminal activity requires "a particularized and objective basis for suspecting . . . criminal activity." *United States v. Green*, 897 F.3d 173, 183 (3d Cir. 2018) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)) (internal quotation marks omitted). To justify the intrusion upon the constitutionally protected right, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.

"Information relayed to police by a third party can support a *Terry* stop if 'the communication . . . possessed sufficient indicia of reliability.'" *United States v. Cephas*, 808 F. App'x 122, 124 (3d Cir. 2020) (quoting *United States v. Brown*, 448 F.3d 239, 250 (3d Cir. 2006)). When assessing reliability of an informant's tip, courts consider: (1) whether the

---

[4] The Government initially argued in its response brief that the information from the CI provided reasonable suspicion to stop Liz because the officers had reason to believe that Liz was a felon, and therefore unable to legally possess a firearm. *See* United States' Opp. to Defendant's Mot. to Suppress at ECF No. 37 at 6 (arguing that "[t]he informant claimed eyewitness knowledge of the crimes he alleged were taking place-namely, that Liz was in possession of a machine gun, which is per se illegal, and that Liz, a felon, was in possession of two firearms and a cache of ammunition."). However, at the conclusion of the suppression hearing held on August 16, 2024, the Government seemingly abandoned that argument and conceded that there was no evidence presented that the officers knew that Liz was a convicted felon. *See* Tr. at 185:16-25, 186: 1-5. Liz did not object to the Government's change in legal position.

information was provided face-to-face allowing an officer to assess the informant's credibility; (2) the informant can be held accountable if the allegations are not true; (3) "the information would not be available to the ordinary observer"; (4) "the informant has recently witnessed the criminal activity at issue"; and (5) the informant's tip "accurately predicts future activity." *United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010). The identity of the tipster is a key factor in the reliability analysis because a known informer's reputation can be assessed, and the known informant can be held accountable if the "allegations turn out to be fabricated." *Cephas*, 808 F. App'x at 124 (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)). "These factors are not exhaustive, and 'a tip need not bear all of the indicia [of reliability]—or even any particular indicium—to supply reasonable suspicion.' 'Other factors can bolster what would otherwise be an insufficient tip,' including 'the presence of a suspect in a high[-]crime area[.]'" *United States v. Torres*, 961 F.3d 618, 624 (3d Cir. 2020) (citations omitted). Whether an officer has an objectively reasonable suspicion to justify the *Terry* stop is evaluated based on the totality of the circumstances. *Johnson*, 592 F.3d at 449.

The Court credits the testimony of Sergeant Dowe that the CI gave reliable information in the past that assisted law enforcement in their investigations. The Court also finds that the CI provided information that would not be available to the ordinary observer. The CI gave information regarding the specific location of the firearms in Liz's vehicle and accurately predicted that Liz would be arriving at the Gas Works gas station shortly after providing the officers with information. However, there is no indication that the CI provided the officers with any indication that Liz was engaged in criminal activity. Sergeant Dowe testified on direct examination that the CI informed the officers that "there is a rifle on the driver side of the vehicle and there is also a handgun in his waist." (Tr. at 135: 20-21.) Sergeant Dowe also testified on cross examination that the CI mentioned that "he saw Brian with a machine gun or a rifle in his vehicle and he has a handgun in his waist." (*Id.* at 156: 11-13.) Thus, according to the information provided to Sergeant Dowe, Liz possessed either a firearm, a high-powered rifle, or a machine gun. First, it is well-established that it is not illegal to possess a firearm in the Virgin Islands. As stated by the Third Circuit, "[i]t is not necessarily

a crime to possess a firearm in the Virgin Islands, *see* V.I. CODE ANN. tit. 23, § 470; nor does a mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, justify an officer in stopping a suspect absent the reasonable suspicion required by *Terry*." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). Under Virgin Islands law, it is illegal to possess a "machine gun" *unless otherwise authorized by law.* 14 V.I.C. § 2253(b) (emphasis added).[5] Under Virgin Islands law, a "machine gun" is defined as "any firearm, as defined in Title 23, section 451(f) of this Code, which shoots automatically more than 12 shots without reloading." 14 V.I.C. § 2253(d)(2). There was no evidence that the officers knew that Liz did not possess a license to carry any of the firearms the CI claimed was in his vehicle. Thus, in the Virgin Islands, the law is clear, "the possession of a firearm in the Virgin Islands, in and of itself, does not provide officers with reasonable suspicion to conduct a *Terry* stop." *United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012).

Moreover, there is insufficient evidence that the officers had reasonable suspicion that Liz possessed an item that would be considered a "machinegun" under federal law. The CI's conclusory statement that Liz possessed a machinegun was not articulable nor particularized. As will be further explained in more detail below, *see infra* Section II(C), the determining characteristic of a "machinegun," as defined under federal law, is the ability to shoot automatically "by a single function of the trigger." 26 U.S.C. § 5845 (b). The CI provided no information for the officers to conclude that the firearm he saw in Liz's vehicle had the ability to shoot automatically by a single function of the trigger. Thus, the Court concludes that the officers were proceeding under a hunch or generalized suspicion that Liz possessed a machinegun. The Fourth Amendment does not allow searches, stops, or seizures based on hunches or generalized suspicions. *See United States v. Torres*, 961 F.3d 618, 623 (3d Cir. 2020) (explaining that "reasonable suspicion exists if an officer can articulate more than an

---

[5] The use of the term "unless otherwise authorized by law" in the Virgin Islands Code as it relates to firearms licensing would suggest that an individual has a pathway to be authorized to possess a "machine gun" under Virgin Islands law because "'unless otherwise authorized by law' means possession without a license." *United States v. Daniel*, 518 F.3d 205, 208 (3d Cir. 2008) (finding an older version of 14 V.I.C. § 2256, which made it unlawful to possess ammunition "unless authorized by law" unconstitutional because Virgin Islands law d[id] not establish a licensing requirement for ammunition. Nor does it provide any specific procedure by which possession of ammunition may be licensed or otherwise is authorized.")

inchoate and unparticularized suspicion or hunch of criminal activity.") (internal quotations omitted).

### B. The Officers Acted Reasonably in Detaining Liz.

Notwithstanding that the officers did not have reasonable suspicion to stop Liz based on the CI's tip, the Court finds that the officers acted reasonably in using force to detain Liz. When the officers arrived at the Gas Works gas station, they immediately and repeatedly gave Liz commands to get on the ground. Liz disobeyed those commands and kept walking towards the officers. After providing warnings, Officer Arroyo then tased Liz as he was approaching Captain Penn, who had his firearm pointed at Liz. Up until this point, there was no Fourth Amendment stop because Liz failed to yield to a show of authority. To be sure, a "seizure" under the Fourth Amendment requires either: (1) the application of physical force by the police on the suspect; or (2) the submission by the suspect to the officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1999). If a suspect does not submit or ignores an officer's show of authority, there is no seizure until the officer applies physical force. *Id.* at 624-627. "Thus, any action taken by the defendant up to the point of physical contact, or submission to authority, 'can be considered in evaluating reasonable suspicion.'" *United States v. Johnson*, 238 F. Supp. 2d 663, 671 (D. De. 2002) (quoting *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000)).

At the time the officers applied force: (1) they had reason to believe Liz had firearms in his vehicle; (2) the officers knew from a prior encounter with Liz, he had a prior physical altercation with police where he shoved an officer and ran away; (3) the officers gave Liz multiple commands which he ignored; and (4) the officers warned him that he would be tased if he did not comply. Most importantly, Liz was disobeying commands and was walking towards another officer who had a gun pointed at him and motioned to aggressively make physical contact with Captain Penn. In its totality, all of this information provided the officers with an objectively legal basis to subdue Liz. *See e.g.*, *Brown v. Cwynar*, 484 F. App'x 676, 678-80 (3d Cir. 2012) (concluding that officers acted reasonably in tasing suspect who was acting belligerent, refusing to obey police commands, and scuffling with law enforcement officers); *United States v. Fields*, 449 F. App'x 146, 147-49 (3d Cir. 2011) (concluding that the trial court

did not err in denying motion to suppress where suspect failed "to yield to a show of authority and created an environment where the officers felt threatened; therefore, the use of physical force was reasonable under the objective reasonableness standard."). The Court finds it unreasonable to suggest that officers were required to allow Liz to make physical contact with another officer or allow Liz to retreat to his vehicle before they could apply force.

After subduing Liz and placing him under arrest, the officers retrieved the keys to the vehicle from his person. Thus, based on the totality of the circumstances, and Liz's refusal to obey commands, the Court finds that the officers acted reasonably and will deny the motion to suppress the retrieval of the keys. *See United States v. Naim Nafis Shakir*, 616 F.3d 315, 317-321 (3d Cir. 2010) (explaining the search incident to arrest exception to the warrant requirement allowing an officer to search the person arrested in order to remove any weapons or other items that the latter might seek to use in order to resist arrest or effect an escape.).

### C. The Plain View Doctrine Does Not Apply to the Facts of this Case.

Turning to the search of Liz' vehicle, the Government argues in its supplemental brief that the officers had the authority to seize the evidence from Liz's vehicle under the plain view exception to the warrant requirement. The Government argues that "Dowe's observation of an AR-15-style platform rifle with a 50-round drum magazine" and his training and experience in firearms made the weapon's incriminating nature readily apparent and "allowed Dowe to reasonably conclude that the firearm in question was an illegal machinegun under federal law." (ECF No. 113 at 4.) Liz failed to address the plain view exception in his supplemental brief.

Under the plain view doctrine, it is reasonable for law enforcement to seize evidence in plain view without a warrant provided: 1) the officer is lawfully in the place from which the evidence is in plain view and has lawful right of access to the object itself; and 2) the incriminating character of the evidence is immediately apparent. *Horton v. California,* 496 U.S. 128, 136-137 (1990). The incriminating character of an item is immediately apparent if the officers have probable cause to believe that it is evidence of a crime. *See United States v.*

*Law*, 384 F. App'x. 121, 122 (3d Cir. 2010) ("With respect to an object's incriminating character . . . the plain view doctrine is satisfied only where police have probable cause to believe that an object is contraband.") "The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item firsthand, its owner's privacy interest in that item is lost." *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983). "The Government bears the burden of establishing that the plain view doctrine applies to the seizure in question." *United States v. Dyer*, 54 F.4th 155, 158 (3d Cir. 2022).

The Court has little trouble concluding that the first element of the plain-view doctrine is present in this case. The officers did not violate Liz's rights in arriving at the Gas Works gas station – a gas station that is open to the public. With regards to the third element, if the Government can establish that the firearm was evidence of a crime, the automobile exception would allow the officers to seize the item inside the vehicle. *See Donahue*, 764 F.3d at 299-300 (3d Cir. 2014) (opining that the automobile exception to the warrant requirement "permits vehicle searches without a warrant if there is probable cause to believe that the vehicle contains evidence of a crime.") (internal quotations omitted). The crux of the issue in this case is whether the incriminating character of the firearm was immediately apparent. The Court concludes that it was not.

While both Virgin Islands law and federal law provides for the definition of a "machine gun," the Government has made clear that it is proceeding under the federal law definition.[6] Under federal law, a "machinegun" means "any weapon which shoots, is designed to shoot, or can be readily restored to, automatically more than one shot, without manual reloading, *by a single function of the trigger*." 26 U.S.C. § 5845(b) (emphasis added).[7]

---

[6] As mentioned above, Virgin Islands law defines a "machine gun" as any firearm, as defined in Title 23, section 451(f) of this Code, which shoots automatically more than 12 shots without reloading." 14 V.I.C. § 2253(d)(2). This is not synonymous with the definition of "machinegun" under federal law. *See United States v. McKie*, 112 F.3d 626, 627 (3d Cir. 1997) (stating that a Tec-9 pistol would be considered a machine gun under Virgin Islands law but that this firearm would not be classified as a machine gun under federal law but as a semiautomatic assault weapon under 18 U.S.C. § 921(a)(30)(a)(viii)).

[7] This definition "also includes the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine

In *Cargill*, the Supreme Court thoroughly explained the distinguishing characteristic that qualifies a firearm as a machinegun under federal law. There, the Supreme Court stated that the plain language of section 5845(b) "asks whether a weapon 'shoots . . . automatically more than one shot . . . by a single function of the trigger.'" *Garland v. Cargill*, 602 U.S. 406, 424 (2024) "Because the statutory definition is keyed to a 'function of the trigger,' only the trigger assembly is relevant for our purposes." *Id.* at 416. Thus, the Government was required to show that the officers had probable cause to believe that the weapon at issue in this matter had the ability to shoot automatically more than one shot without manual reloading "by a single function of the trigger."

Here, there was absolutely no evidence concerning the functioning of the trigger of the firearm discovered in Liz's vehicle. Similarly, there was no evidence concerning whether Sergeant Dowe had probable cause to believe that the weapon could shoot more than one shot "by a single function of the trigger." As a matter of fact, the word "trigger" was not used during these proceedings whatsoever. The only evidence in this case, as argued by the Government, is that the weapon was an AR-15-style platform firearm with a 50-round drum with no butt stock. Notwithstanding Sergeant Dowe's training and experience,[8] there was no testimony connecting the 50-round drum to the firearm's ability to fire more than one shot automatically by a single function of the trigger. This inferential chain is nonexistent. Simply stated, there is no evidence in this record to conclude that a 50-round drum is synonymous – or in any way connected – with automatic firing. Moreover, the absence of a butt stock would tend to weaken the Government's argument that the weapon could fire more than one shot automatically. As the Supreme Court stated in *Cargill*, "[n]o one disputes that a

---

gun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

[8] Apart from Dowe's testimony that he "did countless Glock trainings with NRA" in order to be a firearms instructor, he did not testify that he has any training or experience in identifying or using semiautomatic and automatic weapons, including AR-15 style rifles or machineguns, or that he has any training and experience with respect to modifying semiautomatic weapons such as AR-15 style rifles into automatic weapons, such as machineguns. *Vargas v. Toledo Davila*, No. CIV. 08-1527 (CVR), 2010 WL 624135, at *11 (D.P.R. Feb. 17, 2010) (finding that "the state agents who participated in the search and seizure of the weapons" lacked "training or information as to the legality of the ammunition or the weapons covered by the hunting licenses held by plaintiffs, which evidently would have established there was no offense present and no probable cause for . . . the search.").

semiautomatic rifle *without* a bump stock is not a machinegun because it fires only one shot per 'function of the trigger.'" *Id*. (emphasis added).[9]

The statutory definition of machinegun does not hinge on the number of rounds the firearm can discharge. "The statutory definition instead hinges on how many shots discharge when the shooter engages the trigger." *Id*. at 422. The description provided applies to a semiautomatic weapon just as much as it would apply to a fully automatic weapon, vis-à-vis, a machinegun.[10] Sergeant Dowe's testimony provided no insight on this distinction. There is no indication that simply because a weapon contains a 50-round drum, that fact somehow classifies the weapon as a "machinegun" under federal law. Sergeant Dowe did not explain the significance of a weapon containing a 50-round drum as it relates to the ability of a firearm to fire multiple rounds by the single pull of the trigger. Accordingly, because the record is devoid of any evidence demonstrating that the firearm discovered in the vehicle had the ability to shoot automatically more than one shot by a single function of trigger, the

---

[9] The Court recognizes that the *Cargill* decision was not issued until June 14, 2024, and that the events in this case took place on October 19, 2022. However, one of the arguments made by the Government in support of the officers being able to identify the weapon as a machinegun was that the weapon had no butt stock. The absence of a butt stock would weigh in favor of the item not being classified as a machinegun in October 2022, which would be consistent with the position of the Bureau of Alcohol, Tobacco, Firearms and Explosives regulations pre-*Cargill*.

[10] In the 1960s, Armalite Corporation developed AR-15 rifle and Colt "obtained the trademark and patents for the AR-15 from Armalite [and] created a semiautomatic version of the rifle for the civilian market. In 1977, the patents to the AR-15 expired, and a number of manufacturers started selling semiautomatic rifles built on the AR-15 platform." *Bianchi v. Brown*, 111 F.4th 438, 454 (4th Cir. 2024). "The AR–15 is the civilian version of the military's M–16 rifle, and is, unless modified, a semiautomatic weapon." *Staples v. United States*, 511 U.S. 600, 603 (1994). "Semiautomatic weapons are not 'machineguns' under the statute." *Cargill*, 602 U.S. at 432 (Sotomayor, J., dissenting). Although "the AR-15's rate of fire can 'be easily converted to . . . mimic military-grade machine guns' with devices like bump stocks, trigger cranks, and binary triggers," *Bianchi*, 111 F.4th at 456, such "techniques for firing semiautomatic firearms at rates approaching those of some machine guns," *id.*, do not satisfy the definition of a machinegun, unless they modify an AR-15 style rifle to "fire more than one shot 'by a single function of the trigger.'" *Cargill,* 602 U.S. at 415. The Supreme Court explained that, in using a semiautomatic AR-15 type firearm "[w]ith or without a bump stock, a shooter must release and reset the trigger between every shot," and "any subsequent shot fired after the trigger has been released and reset is the result of a separate and distinct 'function of the trigger.' All that a bump stock does is accelerate the rate of fire by causing these distinct 'function[s]' of the trigger to occur in rapid succession." *Id.* That is why "a bump stock cannot qualify as a machinegun under § 5845(b)'s definition.". *Id.* at 421. However, some "[m]achinegun variants of the AR–15 style rifle include [a] component known as an auto sear" which "permits a shooter to fire multiple shots while engaging the trigger only once. ATF [Bureau of Alcohol, Tobacco, Firearms and Explosives] has accordingly recognized that modifying a semiautomatic rifle or handgun with an auto sear converts it into a machinegun. *See* ATF Ruling 81–4." *Cargill*, 602 U.S. at 420 n.4.

Court holds that the officers lacked probable cause to believe that the incriminating nature of the firearm was immediately apparent. Thus, the plain view exception does not apply to the search of Liz's vehicle and the items discovered in the vehicle will be suppressed.

### D. Statements Made by Liz

In his motion to suppress, and again, at the outset of the suppression hearing, Liz sought to suppress statements made to law enforcement on October 19, 2022. Specifically, Liz sought to suppress statements made at the police station after he was arrested and taken into custody. (Tr. at 5:18-25 – 6:1-4.)

The Fifth Amendment to the U.S Constitution prohibits the Government from introducing statements made by an individual who is subject to "custodial interrogation" unless that individual first has been given his *Miranda* warning. *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). A person is in custody, for purposes of *Miranda*, when, "in light of the objective circumstances of the interrogation a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted). "Interrogation" is defined as "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). A suspect, however, may waive his *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989). Moreover, even if an individual waived his *Miranda* rights, any statements made by an individual in custody must be voluntary. *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (explaining that a statement is voluntary only when the speaker's "will was not overborne," and the statement was the "product of an essentially free and unconstrained choice by its maker, that was the product of a rational intellect and free will.") The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

While it is clear to the Court that Liz was in "custody" when he was arrested shortly after being tased, the Government did not present any arguments in their brief nor did they present any arguments at the close of the evidence of any statements made by Liz that they seek to introduce at trial. The Government also did not present any arguments that Liz

waived his *Miranda* rights or that any purported statements made by Liz were voluntary. In light of the Government seeming abandonment of the issues surrounding *Miranda*, the Court will preclude the Government from presenting any statements made by Liz during the trial of this matter.

### III.

For the foregoing reasons, the Court will grant, in part and deny, in part, Defendant's motion to suppress. The motion will be denied as to the recovery of the keys found on Liz's person. The motion will be granted as to all items discovered in Liz's vehicle. Lastly, Liz's motion to suppress any statements made at the police station on October 19, 2022, will be granted.

An appropriate Order follows.

**Dated:** December 12, 2024                     */s/ Robert A. Molloy*
                                                **ROBERT A. MOLLOY**
                                                **Chief Judge**